# IN THE SUPREME COURT OF CALIFORNIA

In re KENNETH HUMPHREY
on Habeas Corpus.

S247278

First Appellate District, Division Two
A152056

San Francisco City and County Superior Court
17007715

---

March 25, 2021

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Kruger, Groban and Jenkins concurred.

---

In re HUMPHREY

S247278


Opinion of the Court by Cuéllar, J.


An arrestee's release pending trial is often conditioned on whether the arrestee can make bail. To do so, an arrestee posts security — in the form of cash, property, or (more often) a commercial bail bond — which is forfeited if the arrestee later fails to appear in court. Those who can't afford to satisfy the bail condition remain in jail until the end of the criminal proceedings.

Underlying this arrangement is a major premise: that the state has a compelling interest in assuring the arrestee's appearance at trial and protecting the safety of the victim as well as the public. Yet those incarcerated pending trial — who have not yet been convicted of a charged crime — unquestionably suffer a "direct 'grievous loss' " of freedom in addition to other potential injuries. (*Van Atta v. Scott* (1980) 27 Cal.3d 424, 435 (*Van Atta*).) In principle, then, pretrial detention should be reserved for those who otherwise cannot be relied upon to make court appearances or who pose a risk to public or victim safety. (Cf. *Bearden v. Georgia* (1983) 461 U.S. 660, 661–662 (*Bearden*) [limiting the circumstances in which an indigent probationer may be incarcerated for failure to pay a fine or restitution]; *In re Antazo* (1970) 3 Cal.3d 100, 113–116 (*Antazo*) [same].) But it's a different story in practice: Whether an accused person is detained pending trial often does not depend on a careful, individualized determination of the need to protect public safety, but merely — as one judge observes — on

the accused's ability to post the sum provided in a county's uniform bail schedule. (See Karnow, *Setting Bail for Public Safety* (2008) 13 Berkeley J. Crim. L. 1, 16–17.)

Petitioner Kenneth Humphrey, joined by the Attorney General, challenges this system with a claim as simple as it is urgent: No person should lose the right to liberty simply because that person can't afford to post bail. His claim joins a "clear and growing movement" that is reexamining the use of money bail as a means of pretrial detention. (*ODonnell v. Harris County* (S.D.Tex. 2017) 251 F.Supp.3d 1052, 1084.)

We find merit in Humphrey's claim. The common practice of conditioning freedom solely on whether an arrestee can afford bail is unconstitutional. Other conditions of release — such as electronic monitoring, regular check-ins with a pretrial case manager, community housing or shelter, and drug and alcohol treatment — can in many cases protect public and victim safety as well as assure the arrestee's appearance at trial. What we hold is that where a financial condition is nonetheless necessary, the court must consider the arrestee's ability to pay the stated amount of bail — and may not effectively detain the arrestee "solely because" the arrestee "lacked the resources" to post bail. (*Bearden, supra,* 461 U.S. at pp. 667, 668.)

In unusual circumstances, the need to protect community safety may conflict with the arrestee's fundamental right to pretrial liberty — a right that also generally protects an arrestee from being subject to a monetary condition of release the arrestee can't satisfy — to such an extent that no option other than refusing pretrial release can reasonably vindicate the state's compelling interests. In order to detain an arrestee under those circumstances, a court must first find by clear and

convincing evidence that no condition short of detention could suffice and then ensure the detention otherwise complies with statutory and constitutional requirements. (See *post*, pp. 21–23.)

Detention in these narrow circumstances doesn't depend on the arrestee's financial condition. Rather, it depends on the insufficiency of less restrictive conditions to vindicate compelling government interests: the safety of the victim and the public more generally or the integrity of the criminal proceedings. Allowing the government to detain an arrestee without such procedural protections would violate state and federal principles of equal protection and due process that must be honored in practice, not just in principle.

Because the trial court here failed to consider Humphrey's ability to afford $350,000 bail (and, if he could not, whether less restrictive alternatives could have protected public and victim safety or assured his appearance in court), we agree with the Court of Appeal: Humphrey was entitled to a new bail hearing.

## I.

What brought Humphrey, 66 years old, to this point was his arrest on May 23, 2017, for first degree residential robbery and burglary against an elderly victim, inflicting injury on an elder adult, and misdemeanor theft from an elder adult. (Pen. Code, §§ 211, 368, subds. (c) & (d), 459, 667.9, subd. (a).) The criminal complaint also charged that Humphrey had suffered four prior strike convictions (see *id*., §§ 667, subds. (b)–(i),

1170.12, subds. (a)–(d)) and four prior serious felony convictions (*id.*, § 667, subd. (a)(1)), all for robbery or attempted robbery.[1]

The complaining witness, 79-year-old Elmer J., told police that Humphrey had followed him into his Fillmore District apartment in San Francisco, threatened to put a pillowcase over his head, and demanded money. When Elmer said he had no money, Humphrey took Elmer's cell phone and threw it to the floor. After Elmer handed over $2, Humphrey stole an additional $5 as well as a bottle of cologne. Before leaving, Humphrey moved the victim's walker into the next room, out of reach.

At arraignment on May 31, 2017, Humphrey sought release on his own recognizance (OR) without any condition of money bail. He cited his advanced age, his community ties as a lifelong resident of San Francisco, and his unemployment and financial condition. He also noted the minimal value of the property he was alleged to have stolen, the remoteness of his prior strike convictions (the most recent of which was in 1992), the lack of any arrests over the preceding 14 years, and his history of complying with court-ordered appearances. Humphrey invited the court to impose an appropriate stay-away order regarding the victim, who lived on a different floor of the senior home in which they both resided. The prosecutor requested bail in the amount of $600,000, as recommended by the bail schedule, as well as a criminal protective order directing Humphrey to stay away from the victim.

---

[1] We rely largely on the Court of Appeal's statement of facts. (*In re Humphrey* (2018) 19 Cal.App.5th 1006, 1016–1022 (*Humphrey*); see Cal. Rules of Court, rule 8.500(c)(2).)

The trial court denied Humphrey's request for OR release and, acceding to the People's request, set bail at $600,000. After acknowledging Humphrey's ties to San Francisco and the age of his prior convictions, the court buttressed its decision by citing "the seriousness of the crime, the vulnerability of the victim, as well as the recommendation from pretrial services." The court also ordered Humphrey to stay away from the alleged victim, including the victim's floor in the senior home.

Humphrey challenged this ruling. He did so by filing a motion for a formal bail hearing (Pen. Code, § 1270.2) and an accompanying request for OR release. As an exhibit to his motion, Humphrey, who is African American, attached a 2013 study of San Francisco's criminal justice system, which found that "Black adults in San Francisco are 11 times as likely as White adults to be booked into County Jail" prior to trial. (W. Haywood Burns Inst., *San Francisco Justice Reinvestment Initiative: Racial and Ethnic Disparities Analysis for the Reentry Council, Summary of Key Findings* (2013) pp. 4–5.) The motion also offered additional information about Humphrey's background, including the fact that he had successfully completed the Roads to Recovery drug rehabilitation program and earned a high school diploma while in custody at the San Francisco County Jail from 2005 to 2008; that upon his release he enrolled for nearly two years at City College of San Francisco and served as a mentor for young adults in the community, which ended when he suffered a relapse; and that he successfully completed a residential substance abuse program in May 2016. Finally, Humphrey announced that he had been accepted into another residential substance abuse and mental health treatment program, beginning the day after the date set for the bail hearing.

At the hearing, the prosecutor pointed out the trial court would need to find unusual circumstances to justify a deviation from the bail schedule because Humphrey was charged with robbery, a serious and violent felony (see Pen. Code, § 1275, subd. (c)), and asserted there were no such circumstances here. He also argued that Humphrey's substance abuse and inability to address it constituted "a great public safety risk" and that Humphrey was a flight risk because he faced a lengthy prison sentence based on his prior strike convictions.

The trial court once again denied OR and supervised release, but did find unusual circumstances warranting a reduction of bail to $350,000. The court characterized the current charges as "serious" and similar to those Humphrey had committed in the past, "so that continuity is troubling to the court." Although "little was taken," "that's because the person whose home was invaded was poor [and] I'm not [going to] provide less protection to the poor than to the rich." The court elected to deviate from the bail schedule because of Humphrey's "willingness to participate in treatment, and I do commend that" — but only to a limited extent, citing "public safety and flight risk concerns." The court included an additional condition of bail: that Humphrey participate in the residential treatment program he had identified.

The public defender cautioned that Humphrey was too poor "to make even $350,000 bail" and would therefore be unable to participate in the required residential treatment program. The court did not comment on Humphrey's inability to afford bail. Nor did the court consider whether nonfinancial conditions of release could meaningfully address public safety concerns or flight risk.

Humphrey filed a petition for writ of habeas corpus in the Court of Appeal. Requiring money bail as a condition of release at an amount the accused cannot pay, he claimed, is nothing less than the functional equivalent of a pretrial detention order — which can be justified only if the state establishes a compelling interest in detaining the accused and demonstrates that detention is *necessary* to further that purpose. (*Humphrey*, *supra*, 19 Cal.App.5th at p. 1015.) He requested immediate OR release or, in the alternative, a remand to the superior court for a new hearing consistent with what the California Constitution requires and with the substantive and procedural protections discussed in *United States v. Salerno* (1987) 481 U.S. 739. During such a hearing, the court could either (1) set the least restrictive, nonmonetary conditions of release necessary to protect public safety; or (2) if necessary to assure his appearance at future court hearings, impose a financial condition of release only upon making inquiry into and findings concerning Humphrey's ability to pay. (*Humphrey*, at pp. 1015–1016.) After initially opposing the petition, the Attorney General filed a return and agreed that Humphrey was entitled to a new bail hearing. The Attorney General added that he would no longer defend " 'any application of the bail law that does not take into consideration a person's ability to pay, or alternative methods of ensuring a person's appearance at trial.' " (*Id*. at p. 1016.)

The Court of Appeal granted habeas corpus relief, reversed the bail determination, and directed the trial court to conduct a new bail hearing. (*Humphrey*, *supra*, 19 Cal.App.5th at p. 1016.) In its opinion, the court declared that principles of due process and equal protection "dictate that a court may not order pretrial detention unless it finds either that the defendant has the financial ability but failed to pay the amount of bail the

court finds reasonably necessary to ensure his or her appearance at future court proceedings; or that the defendant is unable to pay that amount and no less restrictive conditions of release would be sufficient to reasonably assure such appearance; or that no less restrictive nonfinancial conditions of release would be sufficient to protect the victim and the community." (*Id.* at p. 1026; see also *id.* at pp. 1041, 1045.) Because the trial court had not made any such findings, the Court of Appeal remanded to allow "a new bail hearing at which the court inquires into and determines his ability to pay, considers nonmonetary alternatives to money bail, and, if it determines petitioner is unable to afford the amount of bail the court finds necessary, follows the procedures and makes the findings necessary for a valid order of detention." (*Id.* at p. 1014.)

No party petitioned for review. On remand, the superior court conducted a new bail hearing and ordered Humphrey released on various nonfinancial conditions, including electronic monitoring, an order to stay away from the victim and his residence, and participation in a residential substance abuse treatment program for seniors. A few weeks later, upon request by several entities (including the District Attorney of the City and County of San Francisco, which had not been designated a party in the Court of Appeal), we granted review on our own motion to address the constitutionality of money bail as currently used in California as well as the proper role of public and victim safety in making bail determinations.[2]

---

[2] Although Humphrey himself was no longer detained or subject to money bail, we granted review to address "important

## II.

It is one thing to decide that a person should be charged with a crime, but quite another to determine, under our constitutional system, that the person merits detention pending trial on that charge.  Even when charged with a felony, noncapital defendants are eligible for pretrial release — on their own recognizance, on OR supervised release, or by posting money bail.  When people can obtain their release, they almost always do so:  The disadvantages to remaining incarcerated pending resolution of criminal charges are immense and profound.

If not released, courts have observed, the accused may be impaired to some extent in preparing a defense.  (See *Van Atta*, *supra*, 27 Cal.3d at pp. 435–436; accord, *Gerstein v. Pugh* (1975) 420 U.S. 103, 123.)  Empirical evidence reveals additional disadvantages.  Studies suggest that pretrial detention heightens the risk of losing a job, a home, and custody of a child.  (See *Barker v. Wingo* (1972) 407 U.S. 514, 532–533; *Van Atta*, at p. 436.)  And while correlation doesn't itself establish causation, time in jail awaiting trial may be associated with a higher likelihood of reoffending, beginning anew a vicious cycle.  (See Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention* (2017) 69 Stan. L.Rev 711, 759–769; Pepin, 2012–2013 Policy Paper:  Evidence-Based Pretrial Release (2013) p. 5; Lowenkamp et al., The Hidden Costs of Pretrial Detention (2013) p. 4.)

---

issues that are capable of repetition yet may evade review" and " 'to provide guidance for future cases.' "  (*In re White* (2020) 9 Cal.5th 455, 458, fn. 1.)

Pretrial detention also forces the state to bear the cost of housing and feeding those arrestees who could properly be released.  (See *Van Atta, supra,* 27 Cal.3d at pp. 436–437.)  On any given day, nearly half a million people — none of whom has yet been convicted of a charged offense — sit in America's jails awaiting trial.  (Crim. Justice Policy Program, Harvard Law School, Bail Reform:  A Guide for State and Local Policymakers (Feb. 2019) p. 1 ["increases in pretrial detention rates are 'responsible for all of the net jail growth in the last twenty years' "].)  This represents nearly 20 percent of the world's pretrial jail population.  (*Id*. at p. 7.)  Just six California counties (Alameda, Fresno, Orange, Sacramento, San Bernardino, and San Francisco), for example, spent $37.5 million over a two-year period jailing people who were never charged or who had charges dropped or dismissed.  (See Human Rights Watch, "Not in it for Justice":  How California's Pretrial Detention and Bail System Unfairly Punishes Poor People (Apr. 11, 2017) p. 3; see generally Schnacke, Fundamentals of Bail:  A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform (Sept. 2014) p. 15 ["the United States Department of Justice estimates that keeping the pretrial population behind bars costs American taxpayers roughly 9 billion dollars per year"].)

Although California courts deny bail outright to felony defendants at roughly the same rate as courts in the rest of the country (Tafoya, Pretrial Detention and Jail Capacity in California (July 2015)),[3] arrestees in large urban counties in

_____

[3]    <https://www.ppic.org/publication/pretrial-detention-and-jail-capacity-in-california/> [as of Mar. 25, 2021]; all Internet

California reportedly end up in pretrial detention at much higher rates than arrestees in large urban counties elsewhere. (*Ibid*.) Part of the disparity may arise from the fact that even when bail is technically allowed, the amount that must be posted is considerably higher in California, on average, than elsewhere. And not in a way that can plausibly be justified by the state's higher cost of living: "The median bail amount in California ($50,000) is *more than five times* the median amount in the rest of the nation (less than $10,000)." (*Ibid.*, italics added.)

The indiscriminate imposition of money bail has consequences. "[S]ome people currently in California jails who are safe to be released are held in custody solely because they lack the financial resources for a commercial bail bond, and other people who may pose a threat to public safety have been able to secure their release from jail simply because they could afford to post a commercial bond." (Pretrial Detention Reform Workgroup, Pretrial Detention Reform: Recommendations to the Chief Justice (Oct. 2017) p. 25.)

That disparity lies at the heart of this case.

## III.

Twice, the superior court granted Humphrey bail — and on both occasions, the trial court set bail at sums Humphrey couldn't afford. Initially set at $600,000, bail was then reduced, after a formal bail hearing, to the still substantial sum of $350,000. At no point did the court inquire into Humphrey's ability to pay such an amount. As it turned out, Humphrey

---

citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

could not post bail so he remained in custody, even though a person facing similar charges, but with greater means, would've been able to post bail and be released.

The United States Supreme Court "has long been sensitive to the treatment of indigents in our criminal justice system." (*Bearden*, *supra*, 461 U.S. at p. 664.) So have we. (See *Antazo*, *supra*, 3 Cal.3d at pp. 116–117.) Humphrey asks whether it is constitutional to incarcerate a defendant solely because he lacks financial resources. We conclude it is not.

Neither this court nor the United States Supreme Court has yet held that a judge must consider what an arrestee can pay when fixing the amount of money bail. But from cases resolving analogous questions, we can perceive a theme. Consider *Bearden*, *supra*, 461 U.S. 660, which examined the permissibility of imprisoning a probationer for failing to satisfy the balance due on a court-ordered fine and restitution. (*Id.* at pp. 661–662.) Bearden argued that it violated the federal Constitution to imprison him "solely because" he lacked the ability to make these payments — a proposition that garnered agreement from the Supreme Court. (*Id.* at p. 661.) *Bearden*'s analysis proves illuminating in our assessment of whether it likewise violates the state and federal Constitutions to hold an arrestee in custody solely because the arrestee cannot afford bail.

In *Bearden*, the court understood itself to be resolving "whether a sentencing court can revoke a defendant's probation for failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." (*Bearden*, *supra*, 461 U.S. at p.

665.) The parties had examined this question "primarily in terms of equal protection," which inquired "whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation." (*Id.* at pp. 665, 666.) Yet the court didn't quite buy the parties' argument that equal protection sufficiently captured the problem Bearden identified. Because "indigency in this context is a relative term rather than a classification, fitting 'the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished.' " (*Id.* at p. 666, fn. 8.) The court found the "more appropriate question" (*ibid.*) instead to be "whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine" (*id.* at p. 666).

Since the latter question turned out to be "substantially similar" to the equal protection inquiry (*Bearden, supra,* 461 U.S. at p. 666), the court treated this case as one where "[d]ue process and equal protection principles converge" (*id.* at p. 665). This led the court to conclude that "[w]hether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose' " in the case at hand. (*Id.* at pp. 666–667, fn. omitted.)

At stake in *Bearden* was the probationer's conditional freedom after pleading guilty to burglary and theft. (*Bearden, supra,* 461 U.S. at pp. 662, 672.) By granting Bearden probation, Georgia had already determined that its "penological

interests" did not require imprisonment (*id*. at p. 670) and that a fine and restitution could be the appropriate penalty for his crime. (*Id*. at p. 667.) To be sure: His failure to pay those debts *may* have indicated "that this original determination need[ed] reevaluation, and imprisonment may now be required to satisfy the State's interests." (*Id*. at p. 670.) But that would be so only under limited conditions: if the court determined (1) that he had the means to pay and willfully refused to do so *or* (2) that alternative measures would not be adequate "to meet the State's interests in punishment and deterrence." (*Id*. at p. 672.) In other words, "[o]nly if the sentencing court determines that alternatives to imprisonment are not adequate in a particular situation to meet the State's interest in punishment and deterrence may the State imprison a probationer who has made sufficient bona fide efforts to pay." (*Ibid*.)

The Supreme Court then remanded the matter to allow the Georgia courts to determine either that Bearden had not made sufficient bona fide efforts to pay his fine or that alternative punishment could not satisfy the state's interest in punishment and deterrence. (*Bearden, supra*, 461 U.S. at p. 674.) In the absence of such findings, though, "fundamental fairness" required that Bearden remain on probation. (*Ibid*.)

Principles of equal protection and substantive due process likewise converge in the money bail context. The accused retains a fundamental constitutional right to liberty. (See *United States v. Salerno, supra*, 481 U.S. at p. 750 (*Salerno*); Cal. Const., art. I, § 7.) Further, the state's interest in the bail context is not to punish — it is to ensure the defendant appears at court proceedings and to protect the victim, as well as the

public, from further harm. (See Cal. Const., art. I, §§ 12, 28, subd. (f)(3); Pen. Code, § 1275, subd. (a)(1).)[4]

---

[4]    Appearing as amici curiae, the District Attorneys of San Bernardino and San Diego Counties question whether the concepts of substantive due process and equal protection even have a role to play in setting or reviewing bail. According to this view, Humphrey's entitlement to relief, if any, can derive only from the Eighth Amendment to the United States Constitution and its specific prohibition on excessive bail. (Cf. *Graham v. Connor* (1989) 490 U.S. 386, 394–395.) We disagree. Equal protection and due process apply in a wide variety of contexts where the government imposes benefits or burdens on people. It's true "that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (*United States v. Lanier* (1997) 520 U.S. 259, 272, fn. 7.) But the claim that bail is excessive under the Eighth Amendment is not one Humphrey makes in this case — and this opinion does not purport to address or resolve any such claim. His objection instead targets the *method* by which his bail was determined. What he claims is that because the trial court failed to consider his ability to pay or the efficacy of less restrictive conditions of release, he was detained without adequate justification. Because that sort of claim is not " 'covered by' " the Eighth Amendment (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 843), neither *Graham* nor *Lanier* precludes his hybrid argument based on the convergence of the due process and equal protection clauses. (See *Walker v. City of Calhoun* (11th Cir. 2018) 901 F.3d 1245, 1259; *ODonnell v. Harris County* (5th Cir. 2018) 892 F.3d 147, 157; *U.S. v. Giangrosso* (7th Cir. 1985) 763 F.2d 849, 851; see generally *Salerno, supra,* 481 U.S. at p. 749 [recognizing an arrestee's general substantive due process right to liberty prior to a judgment of guilt].) Those latter clauses protect the "specific constitutional right[s] allegedly infringed" here. (*Graham,* at p. 394.)

Yet if a court does not consider an arrestee's ability to pay, it cannot know whether requiring money bail in a particular amount is likely to operate as the functional equivalent of a pretrial detention order. Detaining an arrestee in such circumstances accords insufficient respect to the arrestee's crucial state and federal equal protection rights against wealth-based detention as well as the arrestee's state and federal substantive due process rights to pretrial liberty.

Other jurisdictions have similarly concluded that detaining arrestees solely because of their indigency is fundamentally unfair and irreconcilable with constitutional imperatives. (See *Walker v. City of Calhoun*, *supra*, 901 F.3d 1245, 1258; *ODonnell v. Harris County*, *supra*, 892 F.3d at pp. 162–163; *Hernandez v. Sessions* (9th Cir. 2017) 872 F.3d 976, 992 ["By maintaining a process for establishing the amount of a bond that likewise fails to consider the individual's financial ability to obtain a bond in the amount assessed or to consider alternative conditions of release, the government risks detention that accomplishes 'little more than punishing a person for his poverty' "]; *Pugh v. Rainwater* (5th Cir. 1978) 572 F.2d 1053, 1057 ["The incarceration of those who cannot [afford bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements"]; *Brangan v. Com.* (Mass. 2017) 80 N.E.3d 949, 954; *Valdez-Jimenez v. Eighth Judicial Dist. Court of Nevada* (Nev. 2020) 460 P.3d 976, 984 ["bail must not be in an amount greater than necessary to serve the State's interests"]; *State v. Huckins* (Wn.App. 2018) 426 P.3d 797, 804 ["the court abused its discretion by requiring monetary bail without considering less restrictive conditions as required by the law"].)

What we must therefore conclude is that pretrial detention is subject to state and federal constitutional constraints. Consistent with the aforementioned principles, we hold that such detention is impermissible unless no less restrictive conditions of release can adequately vindicate the state's compelling interests. (Cf. *Bearden*, *supra*, 461 U.S. at p. 672 ["Only if the sentencing court determines that alternatives to imprisonment are not adequate in a particular situation to meet the State's interest in punishment and deterrence may the State imprison a probationer who has made sufficient bona fide efforts to pay"]; accord, *Antazo*, *supra*, 3 Cal.3d at p. 114 ["Because the state has available to it these alternative methods of collecting fines, we cannot conclude that imprisonment of indigents is necessary to promote this state interest"].)[5]

---

[5]  *In re York* (1995) 9 Cal.4th 1133 did not consider — and thus did not reject — the hybrid due process/equal protection challenge Humphrey has asserted here. York claimed a violation of equal protection when the court required him to submit to drug testing and warrantless searches as conditions for his OR release. He complained that such conditions "could not be imposed upon a defendant who is able to, and does, post reasonable bail." (*York*, at p. 1152.) We indulged, "without deciding," York's predicate assumption that those on bail could not be subjected to conditions other than those related to assuring the arrestee's appearance in court (*ibid.*) — but we have since rejected this assumption as mistaken. (See *In re Webb* (2019) 7 Cal.5th 270, 278 ["trial courts have authority to impose reasonable conditions related to public safety on persons released on bail"]; see generally Cal. Const., art. I, § 28, subd. (b)(3).) *York* never considered whether or to what extent a court must consider a defendant's financial resources in setting bail.

## IV.

In light of our conclusion that courts must consider an arrestee's ability to pay alongside the efficacy of less restrictive alternatives when setting bail, it may prove useful for us to sketch the general framework governing bail determinations.

When making any bail determination, a superior court must undertake an individualized consideration of the relevant factors. These factors include the protection of the public as well as the victim, the seriousness of the charged offense, the arrestee's previous criminal record and history of compliance with court orders, and the likelihood that the arrestee will appear at future court proceedings. (Cal. Const., art. I, §§ 12, 28, subds. (b)(3), (f)(3); Pen. Code, § 1275, subd. (a)(1).)

The voters amended the Constitution to grant the people of this state the right to have the safety of the victim and the victim's family considered in the bail determination process. (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) text of Prop. 9, p. 129.) To that end, they added "the safety of the victim" to the list of factors that a court shall consider in "setting, reducing or denying bail" ensuring that it, along with public safety, will be "the primary considerations" in those determinations. (Cal. Const., art. I, § 28, subd. (f)(3); see Pen. Code, § 1275, subd. (a)(1).) Along with those primary considerations of victim and public safety, the court must assume the truth of the criminal charges. (See *Ex parte Duncan* (1879) 53 Cal. 410, 411; *Ex parte Ruef* (1908) 7 Cal.App. 750, 752.) These are constitutionally permissible considerations, within certain parameters. (See *Salerno*, *supra*, 481 U.S. at pp. 750–751 ["When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or

the community we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat"]; *U.S. v. Fidler* (9th Cir. 2005) 419 F.3d 1026, 1028 ["the detention is not based solely on the defendant's inability to meet the financial condition, but rather on the district court's determination that the amount of the bond is necessary to reasonably assure the defendant's attendance at trial or the safety of the community"].)

In determining what kind of threat to victim or public safety is required, we look to the standard of proof set forth in article I, section 12 of the California Constitution. Because that provision requires a court to find the specified risk of harm by "clear and convincing evidence" before detaining an arrestee by denying bail (Cal. Const., art. I, § 12, subds. (b), (c)), we similarly interpret our Constitution to bar a court from causing an arrestee to be detained pretrial based on concerns regarding the safety of the public or the victim, unless the court has first found clear and convincing evidence that no other conditions of release could reasonably protect those interests.

Our state Constitution does not explicitly state what standard of proof is required to justify pretrial detention when an arrestee poses a flight risk. On reflection, we agree with Humphrey that the standard of proof should likewise be clear and convincing evidence. There is no compelling reason why the quantum of evidence needed to establish that a given arrestee poses a risk of flight should differ from the quantum of evidence needed to establish that a given arrestee poses a risk to public or victim safety. (See *Kleinbart v. United States* (D.C. 1992) 604 A.2d 861, 870 ["A defendant's liberty interest is no less — and thus requires no less protection — when the risk of his or her flight, rather than danger, is the basis for justifying detention

without right to bail"]; cf. Pen. Code, § 1272.1, subds. (a), (b) [applying the clear and convincing standard of proof to both the risk of flight *and* the risk to public safety when analyzing bail on appeal].)   Accordingly, we conclude that our Constitution prohibits pretrial detention to combat an arrestee's risk of flight unless the court first finds, based upon clear and convincing evidence, that no condition or conditions of release can reasonably assure the arrestee's appearance in court.   (See *Humphrey*, *supra*, 19 Cal.App.5th at p. 1037.) [6]

In those cases where the arrestee poses little or no risk of flight or harm to others, the court may offer OR release with appropriate conditions.   (See Pen. Code, § 1270.)   Where the record reflects the risk of flight or a risk to public or victim safety, the court should consider whether nonfinancial conditions of release may reasonably protect the public and the victim or reasonably assure the arrestee's presence at trial.   If the court concludes that money bail is reasonably necessary, then the court must consider the individual arrestee's ability to pay, along with the seriousness of the charged offense and the arrestee's criminal record, and — unless there is a valid basis for detention — set bail at a level the arrestee can reasonably afford.   And if a court concludes that public or victim safety, or the arrestee's appearance in court, cannot be reasonably assured if the arrestee is released, it may detain the arrestee only if it first finds, by clear and convincing evidence, that no

---

[6]    We have not been asked to decide and do not determine here whether the California Constitution permits pretrial detention based on risk of nonappearance or flight alone, divorced from public and victim safety concerns.

nonfinancial condition of release can reasonably protect those interests.

The experiences of those jurisdictions that have reduced or eliminated financial conditions of release suggest that releasing arrestees under appropriate nonfinancial conditions — such as electronic monitoring, supervision by pretrial services, community housing or shelter, stay-away orders, and drug and alcohol testing and treatment (see, e.g., Pen. Code, § 646.93, subd. (c); N.J. Stat. Ann. § 2A:162-17) — may often prove sufficient to protect the community. (See Pretrial Detention Reform Workgroup, Pretrial Detention Reform: Recommendations to the Chief Justice, *supra*, at pp. 51–53; Crim. Justice Policy Program, Harvard Law School, Bail Reform: A Guide for State and Local Policymakers, *supra*, at pp. 26, 38, 44, 49, 59, 62–63.) Yet just as neither money bail (nor any other condition of release) can guarantee that an arrestee will show up in court, no condition of release can entirely *eliminate* the risk that an arrestee may harm some member of the public. (See *In re Nordin* (1983) 143 Cal.App.3d 538, 546 [" 'Prediction of the likelihood of certain conduct necessarily involves a margin of error, but is an established component of our pretrial release system' "].) In choosing between pretrial release and detention, we recognize that absolute certainty — particularly at the pretrial stage, when the trial meant to adjudicate guilt or innocence is yet to occur — will prove all but impossible. A court making these determinations should focus instead on risks to public or victim safety or to the integrity of the judicial process that are reasonably likely to occur. (See *Stack v. Boyle* (1951) 342 U.S. 1, 8 (conc. opn. of Jackson, J.) ["Admission to bail always involves a risk that the accused will take flight. That is a calculated risk which the law takes as the

price of our system of justice"]; cf. *Salerno*, *supra*, 481 U.S. at p. 751 [discussing an arrestee's "identified and articulable threat to an individual or the community"].)

Even when a bail determination complies with the above prerequisites, the court must still consider whether the deprivation of liberty caused by an order of pretrial detention is consistent with state statutory and constitutional law specifically addressing bail — a question not resolved here[7] — and with due process. While due process does not categorically prohibit the government from ordering pretrial detention, it remains true that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." (*Salerno*, *supra*, 481 U.S. at p. 755.)

Marking the boundary between the general rule and the limited exception requires a careful balancing of the government's interest in preventing crime against the individual's fundamental right to pretrial liberty. (*Salerno*, *supra*, 481 U.S. at pp. 749–750.) This territory has not yet been fully mapped, but we can nonetheless discern that an order of detention requires an interest that "is sufficiently weighty" in the given case — and courts should likewise bear in mind that *Salerno* upheld a scheme whose scope was "narrowly focuse[d] on a particularly acute problem." (*Id.* at p. 750.) Indeed, the

---

[7] Because this case does not involve an order *denying* bail, we leave for another day the question of how two constitutional provisions addressing the denial of bail — article I, sections 12 and 28, subdivision (f)(3) — can or should be reconciled, including whether these provisions authorize or prohibit pretrial detention of noncapital arrestees outside the circumstances specified in section 12, subdivisions (b) and (c). (See *In re White*, *supra*, 9 Cal.5th at pp. 470–471.)

law under review there authorized pretrial detention "only on individuals who have been arrested for a specific category of extremely serious offenses." (*Ibid.*; accord, *Com. v. Vieira* (Mass. 2019) 133 N.E.3d 296, 301 ["The practice of pretrial detention on the basis of dangerousness has been upheld as constitutional in part because the Legislature 'carefully limit[ed] the circumstances under which detention may be sought to the most serious of crimes' "].)[8]

A court's procedures for entering an order resulting in pretrial detention must also comport with other traditional notions of due process to ensure that when necessary, the arrestee is detained "in a fair manner." (*Salerno, supra*, 481 U.S. at p. 746; see *Mathews v. Eldridge* (1976) 424 U.S. 319, 335.) Among those fair procedures is the court's obligation to set forth the reasons for its decision on the record and to include them in the court's minutes. (See Cal. Const., art. I, § 28, subd. (f)(3).) Such findings facilitate review of the detention order, guard against careless or rote decision-making, and promote public confidence in the judicial process. (*Humphrey, supra*, 19 Cal.App.5th at p. 1038; see *In re John H.* (1978) 21 Cal.3d 18, 23.)

Accordingly, striking the proper balance between the government's interests and an individual's pretrial right to liberty requires a reasoned inquiry, careful consideration of the individual arrestee's circumstances, and fair procedures. But —

---

[8] Even when eligible for detention under constitutional and statutory provisions, an arrestee who ends up detained "for want of bail" may ask the court to reconsider the bail amount. (Pen. Code, § 1270.2; see *In re Avignone* (2018) 26 Cal.App.5th 195, 200; see generally *In re Weiner* (1995) 32 Cal.App.4th 441, 444.)

as both parties emphasize — this is not a case that requires us to lay out comprehensive descriptions of every procedure by which bail determinations must be made. We leave such details to future cases. (See *In re Nordin*, *supra*, 143 Cal.App.3d at pp. 544–545, fn. 4.)

## V.

In a crucially important respect, California law is in line with the federal Constitution: "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." (*Salerno*, *supra*, 481 U.S. at p. 755.) An arrestee may not be held in custody pending trial unless the court has made an individualized determination that (1) the arrestee has the financial ability to pay, but nonetheless failed to pay, the amount of bail the court finds reasonably necessary to protect compelling government interests; or (2) detention is necessary to protect victim or public safety, or ensure the defendant's appearance, and there is clear and convincing evidence that no less restrictive alternative will reasonably vindicate those interests. (See *Humphrey*, *supra*, 19 Cal.App.5th at p. 1026.) Pretrial detention on victim and public safety grounds, subject to specific and reliable constitutional constraints, is a key element of our criminal justice system. Conditioning such detention on the arrestee's financial resources, without ever assessing whether a defendant can meet those conditions or whether the state's interests could be met by less restrictive alternatives, is not.

Because the trial court failed to determine whether Humphrey had the financial wherewithal to post bail — and, if not, whether less restrictive alternatives could reasonably have satisfied the government's compelling interest in seeking his

detention — the Court of Appeal reversed the trial court's bail order and remanded for the court to conduct a new hearing. Before we granted review, the trial court held that hearing and released Humphrey under various nonfinancial conditions, including his participation in a residential substance abuse treatment program for seniors, electronic monitoring, and an order to stay away from the victim and the victim's residence. In December 2018, Humphrey was released from his court-ordered residential treatment program, but his other nonfinancial conditions remained in place, along with a requirement to attend Alcoholics Anonymous meetings and outpatient treatment. No party sought relief from the Court of Appeal's judgment, and no party is seeking relief from the trial court's most recent ruling. We therefore affirm the judgment of the Court of Appeal.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Humphrey
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX  19 Cal.App.5th 1006
**Rehearing Granted**


_____

**Opinion No.** S247278
**Date Filed:**  March 25, 2021
_____

**Court:**  Superior
**County:**  San Francisco
**Judge:**  Joseph M. Quinn


_____

**Counsel:**

Civil Rights Corps, Alec Karakatsanis, Katherine C. Hubbard; Wilmer Cutler Pickering Hale and Dorr, Seth P. Waxman, Daniel S. Volchok, Thomas G. Sprankling; Jeff Adachi, Public Defender, Matt Gonzalez, Chief Deputy Public Defender, Paul Myslin, Christopher F. Gauge, Anita Nabha and Chesa Boudin, Deputy Public Defenders, for Petitioner Kenneth Humphrey.

Bartell, Hensel & Gressley, Donald J. Bartell, Lara J. Gressley and Michael W. Donaldson for California DUI Lawyers Association as Amicus Curiae on behalf of Petitioner Kenneth Humphrey.

Arnold & Porter Kaye Scholer, Krista Carter, Edmond Ahadome, Michael Isaacs and Oscar Ramallo for Human Rights Watch as Amicus Curiae on behalf of Petitioner Kenneth Humphrey.

Pillsbury Winthrop Shaw Pittman, Thomas V. Loran III; Goodin, MacBride, Squeri & Day and Francine T. Radford for the 22 Social Scientists as Amici Curiae on behalf of Petitioner Kenneth Humphrey.

Keker, Van Nest & Peters, Daniel Purcell, Maya Karwande, Divya Musinipally; and W. David Ball for Crime Survivors for Safety and Justice as Amicus Curiae on behalf of Petitioner Kenneth Humphrey.

Micaela Davis; Peter Eliasberg; David Loy; Remcho, Johansen & Purcell, Robin B. Johansen and James C. Harrison for ACLU of Northern California, ACLU of Southern California, ACLU of San Diego and Imperial Counties and California law professors as Amici Curiae on behalf of Petitioner Kenneth Humphrey.

University of San Francisco School of Law, Lara Bazelon; Columbia School of Law, Kellen R. Funk;  University of Georgia School of Law and Sandra G. Mayson for National Law Professors of Criminal, Procedural, and Constitutional Law as Amici Curiae on behalf of Petitioner Kenneth Humphrey.

McDermott Will & Emery, A. Marisa Chun and Sarah P. Hogarth for the Bar Association of San Francisco, The Los Angeles County Bar Association and The Santa Clara County Bar Association as Amici Curiae on behalf of Petitioner Kenneth Humphrey.

Todd W. Howeth and Michael C. McMahon for California Public Defenders Association and Public Defender of Ventura County as Amici Curiae on behalf of Peitioner Kenneth Humphrey.

Bradley Arant Boult Cummings, J. Bradley Robertson, Candice L. Rucker, Rachel A. Conry and Kimberly M. Ingram for California Association of Pretrial Services, National Association of Pretrial Services Agencies, Pretrial Justice Institute and National Association for Public Defense as Amici Curiae on behalf of Petitioner Kennth Humphrey.

Emily Ludmir Aviad; Michael L. Pomeranz; Jonathan L. Marcus, Paul M. Kerlin and Ryan J. Travers for Faith Leaders and Organizations as Amici Curiae on behalf of Petitioner Kenneth Humphrey.

Venable, Alex M. Weingarten, Belinda M. Vega, Eric J. Blakewell, Matthew M. Gurvitz; and Robert M. Carlson for American Bar Association as Amicus Curiae on behalf of Petitioner Kenneth Humphrey.

Institute for Constitutional Advocacy and Protection, Mary B. McCord, Douglas N. Letter, Joshua A. Geltzer and Seth Wayne for current and former prosecutors and law enforcement officials as Amici Curiae on behalf of Petitioner Kenneth Humphrey.

George Gascón, District Attorney, Sharon L. Woo, Chief Assistant District Attorney, Wade K. Chow, Assistant Chief District Attorney, Allison G. Macbeth, Assistant District Attorney; Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit and Katie L. Stowe, Deputy Attorneys General, for Respondent The People.

Summer Stephan, District Attorney, Mark A. Amador, Linh Lam and Marissa A. Bejarano, Deputy District Attorneys for San Diego County District Attorney as Amicus Curiae on behalf of Respondent The People.

Law Offices of Donald Kilmer, Donald Kilmer and Jessica Danielski for Crime Victims United Charitable Foundation as Amicus Curiae on behalf of Respondent The People.

Michael A. Ramos, District Attorney, and Brent J. Schultze, Deputy District Attorney, for District Attorney of San Bernardino County as Amicus Curiae on behalf of Respondent The People.

Kent S. Scheidegger and Kymberlee C. Stapleton for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Respondent The People.

Albert W. Ramirez and Dale Christopher Miller for Golden State Bail Agents Association as Amicus Curiae.

Xavier Becerra, Attorney General, Edward DuMont, State Solicitor General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Joshua Klein, Deputy State Solicitor General, as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Daniel S. Volchok
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6103

Alec Karakatsanis
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
(202) 844-4975

Joshua A. Klein
Deputy State Solicitor General
1515 Clay Street, Suite 2000
Oakland, CA 94612
(510) 879-0756